UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| KEYESSENCE FOUNTAIN, | ) |  |
|---|---|---|
|  | ) |  |
| Petitioner, | ) |  |
|  | ) |  |
| vs. | ) | Case No. 1:15CV00084 SNLJ |
|  | ) |  |
| UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| Respondent. | ) |  |

## MEMORANDUM AND ORDER

This matter is before the Court on a motion under 28 U.S.C. § 2255 to vacate, set aside or correct sentence by Keyessence Fountain, a person in federal custody. On February 4, 2014, Fountain plead guilty before this Court to the offense of interference with commerce by threat or violence and aiding and abetting the possession of a firearm in furtherance of a crime of violence and, on May 14, 2014, this Court sentenced Fountain to the Bureau of Prisons for a term of 120 months. Fountain's § 2255 motion, which is based on several allegations of ineffective assistance of counsel, is fully briefed and ripe for disposition.

**FACTS**

**1. Indictment.**

On August 15, 2013, a grand jury for the Eastern District of Missouri, Southeastern Division, returned a two-count indictment against four defendants; Keyessence Fountain, Darryl House, Kevin Stitt and Charla Dinkins. Count I of that Indictment charged that the four defendants, aided and abetted by each other, committed

the offense of Interference With Commerce by Robbery in violation of Title 18, U.S.C., §§ 1951 and 2. Count II of that Indictment charged that the four defendants, aided and abetted by each other, Possessed a Firearm in Furtherance of a Crime of Violence in violation of Title 18, U.S.C., §§ 924(c) and 2. The allegations of Count II provided that the firearm was brandished during the commission of that crime. At the time of the Indictment, Keyessence Fountain was incarcerated in state custody for the same offense conduct as the federal charge.

The offense conduct charged in the Indictment was that the four defendants brandished a firearm to commit an armed robbery of the Jayson Jewelry store in Cape Girardeau, Missouri, on September 23, 2009.

**2. Arrest and Pretrial Motions.**

On August 27, 2013, a writ was secured by the Government to transfer custody of the defendant to the federal courts. That writ was served on September 11, 2013. Fountain made her Initial Appearance before Magistrate Judge Lewis M. Blanton on that same date. Attorney Rebecca Burns was appointed to represent Fountain.

On October 18, 2013, Fountain appeared before Judge Blanton and waived her right to file pretrial motions.

**3. Proffer.**

On September 23, 2013, officers met with Keyessence Fountain to discuss the crime that she was charged with. That meeting was conducted pursuant to the terms of a "Proffer Letter," a copy of which is attached to this Response. The terms of that proffer letter explain that Ms. Fountain wished to explore the possibility of cooperating with the

2

Government regarding other defendants charged in her Indictment. That letter explained that Fountain was to give truthful responses to the questions asked of her by the officers attending that proffer interview. The letter explained that the Government would later determine whether to offer Fountain a cooperation agreement, based on the information obtained during the interview. If Fountain's information was truthful, and if the Government declined to offer her a cooperation agreement, the proffer letter provided that the Government would not use the proffer information against her as evidence in their case-in-chief. Fountain and her attorney signed this letter on September 23, 2013. Fountain then answered questions put to her by Cape Girardeau Police Detective Don Perry, ATF SA John Taylor and AUSA Keith D. Sorrell. Fountain's attorney was present during this interview.

During the interview, Fountain related the following facts about the robbery. Fountain moved to Memphis, Tennessee, to be with her boyfriend. She broke up with that boyfriend and had no support in Memphis. She was befriended by Charla Dinkins and Dinkins' boyfriend, Darryl House. Fountain said that she was invited by House and Dinkins to go somewhere for a few days in September, 2009, for a "vacation" and she agreed. Fountain stated that she did not know, at the time she left Memphis, that either House or Dinkins were planning to commit a robbery in Cape Girardeau. Another person, Kevin Stitt, went with them for the trip. Dinkins and House were talking at that time about getting married. The four drove to Cape Girardeau and stayed in a local motel the night before the robbery.

The day before the robbery, Fountain said that they all got up and drove to a location across the street from Jayson Jewelers. Fountain said that she had no idea why they were there. After a short time, the four of them drove over to the jewelry store. Fountain stated that House told her and Stitt to go in the jewelry store to "pick up a set of rings." Fountain stated that House was planning on buying wedding rings for him and Dinkins. Fountain and Stitt went into the store to look at rings. Fountain said that she did not say anything to the clerk, but relied on Stitt to do all the talking. Fountain said that after they had looked at rings for a very short time, House came in the store with a handgun. Fountain said that upon seeing House with the firearm, she became aware that the other three planned a robbery of the jewelry store at this time. Fountain stated that House ordered her to take the jewelry out of the jewelry case, that he pointed the handgun at her and told her got "get real normal." Fountain stated that she was unaware that House had a handgun and that she had not seen him with a handgun before the robbery.

After Fountain gave that version of the events, the officers challenged her story. Fountain then stated that, the evening before the robbery, that she was talking to Dinkins. Dinkins told Fountain that House came to Cape Girardeau to rob a store. Fountain remembered seeing House holding a handgun at an earlier date. Fountain stated that she and Dinkins were unwilling to perform their parts in the robbery, but felt forced to do so by House.

At the time of that interview, the Government was aware of the statements of Kevin Stitt that differed from those of Fountain. For example, Stitt described all four defendants as planning the robbery while they were still in Memphis and that all four

4

knew the purpose of the trip to Cape Girardeau was to rob the jewelry store. Stitt described the four going to different stores the day before the robbery to try to locate a store that might be robbed. The jewelry store clerk that was robbed, Debra Drerup, was actually working in another Jayson Jewelers store in downtown Cape Girardeau the day before the robbery and spoke with Fountain when she came in the store. Fountain was carrying the same large handbag that she was carrying the next day. Fountain asked about wedding rings and asked why that store's rings were not mounted with diamonds. Drerup explained that they didn't mount their rings with diamonds until the customer bought them in that store, but that the Kingshighway store had pre-mounted rings. Fountain then left the store. Fountain denied entering the downtown store or speaking with Drerup.

  Stitt stated that he and Fountain were to enter the jewelry store and play the part of a couple who were getting married and looking at wedding rings. Their part was to distract the clerk until House could come in the store with the handgun. Stitt said that they were holding hands as they walked in the store. Stitt began looking around the store for cameras. He said that Fountain jerked his hand as if to warn him to act more normal. When they entered the store, Stitt said that Fountain was on her cell phone with House, letting him know that there were no other customers in the store. Fountain denied making that call, but the clerk stated that she saw and heard Fountain on her cell phone when she and Stitt entered the store. Stitt said that Fountain discussed their business with the clerk, Debbie Drerup. Drerup testified that Fountain was the one who spoke with her. During her proffer, Fountain denied ever speaking to the clerk.

Based on those significant differences between the statements of Fountain and the other witnesses, and other smaller ones, the Government decided that Fountain was not being truthful in her proffer interview and declined to offer her a cooperation agreement. The Government notified Fountain's attorney of its decision. Fountain's attorney argued strenuously that her client should be allowed to cooperate at House's trial, but that offer was rejected.

**4. Written Guilty Plea.**

The Government prepared a written Plea Agreement for Fountain and her attorney to consider. That agreement was signed by all parties, including Fountain. The terms of that Plea Agreement that are relevant to his case, are set forth in this Response.

Fountain agreed to enter a guilty plea to both of the charges pending in her Indictment pursuant to the Plea Agreement. The Government agreed not to bring any other charges against her related to her participation in the robbery of the Jayson Jewelry store on September 23, 2009. (Plea Agmt., p. 1) Fountain admitted that she understood the elements of the two charges and that she committed those elements. (Plea Agmt., p. 2, 3) Fountain admitted her part in the events of the robbery, as set out in her plea agreement:

> On September 23, 2009, at around 10:30 a.m., Charla Dinkins parked her rented vehicle across the street from the Jayson Jewelers store on Kingshighway Street in Cape Girardeau, Missouri. Kevin Stitt, Darryl House and Keyessence Fountain were in the car with Dinkins. The four had driven to Cape Girardeau from Memphis, Tennessee. Charla Dinkins had rented a vehicle for that trip. On that morning, the four of them had decided to commit an armed robbery of the Jayson Jewelers store. Dinkins, Fountain and Stitt had seen Darryl House with a handgun and knew that he was going to be use the handgun to commit the robbery.

6

The plan was that Dinkins was to be left with the car as a getaway driver while the other three entered and took jewelry and other valuables from the store.

As soon as they could determine that the store was open and no customers were present, Dinkins drove her car to a location near the jewelry store. Kevin Stitt and Keyessence Fountain got out of the rental car and entered the Jayson Jewelers store, posing as a couple interested in wedding rings. Debra Drerup was the store clerk on duty that day. Ms. Drerup asked if she could help the couple. Stitt and Fountain replied that they would like to see some wedding rings. Ms. Drerup seated the couple at a counter and began to show them some rings. Shortly after that, Darryl House entered the store carrying a silver handgun. House pointed the handgun at Ms. Drerup. Drerup saw the handgun and realized that the three people were about to rob the jewelry store. Drerup, who was afraid of being hurt if she resisted, went with Stitt into a back room. Stitt placed handcuffs on her wrists, then wrapped duct tape on top of the handcuffs and over her eyes. Ms. Drerup was then left in the back room. House, Stitt and Fountain took jewelry and cash from the store, then walked out to a car being driven by Charla Dinkins. The four then left to return to Memphis, Tennessee. After a short while, Ms. Drerup pulled the tape off and was able to call the police. Officers arrived and discovered that $91,216 in jewelry and $300 in cash had been taken from the store. No suspects were identified from the initial investigation. Samples from the store were submitted to the Missouri State Highway Patrol laboratory for their analysis.

On May 21, 2012, Cape Girardeau police officers received a report from the laboratory that DNA had been recovered from the handcuffs used to secure Ms. Drerup. That DNA matched a known sample taken from Kevin Stitt, who was in a prison in Tennessee at that time. Cape Police Sergeant Don Perry went to speak with Stitt at prison. After a short time, Stitt admitted that he, House, Fountain and Dinkins robbed the jewelry store. He said that the four drove from their homes in Memphis to Cape Girardeau for the purpose of robbing the jewelry store. House and Dinkins had purchased a set of handcuffs the night before to use in securing the store clerk. Stitt reported that House took the jewelry stolen from the store and disposed of it.

The jewelry stolen from Jaysons Jewelers was manufactured in a location other than the State of Missouri and affected interstate and/or foreign commerce. The location of the robbery of the Jayson Jewelry store was in Cape Girardeau County, within the Eastern District of Missouri.

By this plea, Keyessence Fountain admits that she participated in the armed robbery of the Jayson Jewelers store by distracting the store clerk and gathering jewelry from the store shelves and that she was part of an agreement between herself, House, Dinkins and Stitt to rob the jewelry store with Darryl House's firearm.

(Plea Agmt., pp.3-5)

The Plea Agreement provided that Fountain was aware of the ranges of punishment for her charges. The range of punishment for Count I was a term of imprisonment of not more than twenty years. The range of punishment for Count II was a term of imprisonment of a minimum of seven years and a maximum of life. The Plea Agreement informed Fountain that the sentence to be imposed for Count II was required to be imposed consecutively to the sentence imposed for Count I. (Plea Agmt., p. 5)

The parties agreed on the offense levels for Fountain's offense conduct and agreed that the Total Offense Level for Count I was 21 and that there was not an offense level applicable Count II because the term of imprisonment for that count was set by statute. (Plea Agmt., pp. 6, 7) Fountain agreed to waive her right to appeal all issues up to the time of her guilty plea, and, if the District Court imposed a sentence within the applicable Guideline range, that she would waive her right to appeal her sentence also. (Plea Agmt., pp. 7, 8) Fountain agreed to waive her rights to file a habeas petition, except for claims of prosecutorial misconduct or ineffective assistance of counsel. (Plea Agmt., p. 8)

Fountain agreed that she understood her rights attendant to a trial. In that respect, Fountain agreed with the following:

> In pleading guilty, the defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to

confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

<u>The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights.</u> The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. <u>The defendant has reviewed the government's evidence and discussed the government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the government's case and any defenses</u>.

(Plea Agmt., pp. 10, 11) (Emphasis furnished.)

**5. Guilty Plea Hearing.**

On February 4, 2014, Fountain, her attorney Rebecca Burns, and the Government appeared for a guilty plea hearing before this Court.

Fountain was sworn to tell the truth by the court clerk. (Plea Tr., p.3) Fountain agreed with this Court that her answers to the Court's questions were subject to the penalties of perjury if she did not answer truthfully. (Plea Tr., p. 3) Fountain stated that she was 28 years old and had a high school education. (Plea Tr., p. 3) She could read and write and was in good health. (Plea Tr., pp. 3, 4)

Fountain told this Court that she was satisfied with her attorney, that her attorney had investigated the case to Fountain's satisfaction and that her attorney had done everything that Fountain had requested of her. (Plea Tr., p. 6) Fountain had no gripes or

9

complaints concerning her attorney. (Plea Tr., p. 6) Fountain agreed that, by pleading guilty, she was giving up her rights attendant to a jury trial. (Plea Tr., pp. 6, 7)

Fountain told this Court that she had read the written Plea Agreement and had discussed it in detail with her attorney. (Plea Tr., p. 8) Fountain agreed that her attorney had explained the contents of the Plea Agreement with Fountain and that Fountain understood the contents of the Plea Agreement. (Plea Tr., p. 8) This Court asked Fountain if there was anything in the Plea Agreement that she did not understand. Fountain replied, "Just - - no. No. I better not." (Plea Tr., p. 9) The Court asked if Fountain had any questions about that. Fountain replied, "No, sir." (Plea Tr., p. 9) Fountain agreed that the written Plea Agreement was the complete agreement between her and the Government and that no other promises existed between her and the Government other than the ones set out in the written Plea Agreement. (Plea Tr., p. 9)

Fountain agreed that she was waiving her right to appeal pre-sentencing issues, and was waiving her appeal rights if the Court sentenced her to a within-Guidelines sentence. (Plea Tr., p. 9, 10) Fountain stated that her attorney had explained the sentencing Guidelines. (Plea Tr., p. 10)

This Court informed Fountain that the sentencing Guidelines were only guidelines and that the Court would have the discretion to sentence her within, above or below the Guidelines. This Court informed Fountain that the Court was limited by statute to a sentence of up to twenty years for Count I and up to life for Count II. This Court informed Fountain that the minimum sentence for Count II was a term of imprisonment of seven years. Fountain stated that she understood the Court's sentencing discretion and

statutory sentencing limits. This Court also informed Fountain that the sentence for Count II was required to be served consecutively to the sentence for Count I. Fountain stated that she was aware of that requirement. (Plea Tr., pp.10-13) Fountain stated that, even with the sentencing penalties that this Court had discussed, that she still desired to plead guilty to her charges. (Plea Tr., p. 13) This Court informed Fountain that it would consider the full range of punishment allowable. Fountain stated that she understood the Court's discretion. (Plea Tr., p. 13) Fountain agreed that no one had promised her what sentence she would receive. (Plea Tr., p. 13)

The Government recited the Statement of Facts that is contained in the written Plea Agreement into the plea hearing sentencing record. (Plea Tr., pp. 14-17) Those facts were previously set out above. Fountain told this Court that she heard the statement of facts and that those statements were "true and correct." (Plea Tr., pp. 17, 18) Fountain admitted that she committed the acts as the Government outlined in its statement of facts. (Plea Tr., p. 18) Fountain also admitted that she committed each and every element charged in Counts I and II. (Plea Tr., pp. 18, 19) Fountain told the Court that she was pleading guilty because she was guilty. (Plea Tr., p. 19)

After that plea colloquy, this Court found Fountain guilty, accepted the parties' written Plea Agreement and set the case for a sentencing hearing.

**6. Presentence Investigation Report.**

United States Probation Officer Sherry L. Persinger prepared a Presentence Investigation Report (PSR) for Fountain. That report found that Fountain's Total Offense Level for Count I was 21, the same level that was contemplated by the parties in their

11

written Plea Agreement. (PSR, p. 9) Fountain had a Criminal History Category of I, which resulted in a Guideline range of 37 to 46 months for Count I, and 84 months for Count II. The PSR noted that the sentence for Count II was mandated by statute and was required to be served consecutively to the sentence imposed for Count I. There were no objections to the findings of the PSR. (PSR, p. 18)

**7. Sentencing Hearing.**

On May 14, 2014, this Court conducted a sentencing hearing for Fountain. At the conclusion of that hearing, this Court sentenced Fountain to serve 36 months imprisonment for Count I (a downward variance of one month), to be followed by a consecutive sentence of 84 months for Count II. Fountain was ordered to pay restitution of $93,461.00, to serve three years of supervised release on Count I and five years on Count II, and to pay a $200 special assessment. This Court then informed Fountain of her rights to file an appeal.

**8. Appeal.**

Fountain appealed her sentence and conviction to the Eighth Circuit Court of Appeals. That Court dismissed Fountain's appeal based on her appeal waiver provision in her plea agreement. *United States v. Fountain*, 586 Fed.Appx. 247 (8th Cir. 2014)(Unpublished). That decision was issued on December 5, 2014.

**9. 2255 Petition.**

On May 11, 2015, Fountain filed a petition pursuant to Title 28, U.S.C., § 2255, seeking to vacate, set aside or correct her sentence. Her entire allegation of errors committed by her attorney is set forth below:

**Ground one.**

Court appointed attorney failed to explain the terms of the agreement and failed to advise me as to the true weight of the United States' case against me.

**Ground two.**

Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and consequences of the plea. Attorney spoke of me receiving a guaranteed twenty years if I didn't take the plea deal.

## DISCUSSION

These two grounds are completely refuted by the record of the case. The guilty plea transcript and Fountain's written guilty plea both contain Fountain's representation that she understood the nature of the charges against her and the consequences of her guilty plea. Fountain does not tell this Court what, if any, misunderstandings that she had concerning her guilty plea and sentencing. She does not provide any factual basis for what decision she would have made differently. In short, Fountain asserts that her attorney was ineffective for Fountain herself not understanding the terms of the Plea Agreement.

**1. Fountain Has Not Rebutted the Presumption That Her Attorney Was Effective.**

In order to succeed on a Sixth Amendment claim of ineffective assistance of counsel, a defendant must demonstrate (1) that trial counsel's performance was so

deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney, and (2) trial counsel's deficient performance prejudiced the defense. *United States v. Martinez-Salinas*, 573 F.3d 595, 599 (8th Cir. 2009). Judicial scrutiny of counsel's performance is highly deferential, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment. *Id*.

The above-cited case of *Martinez-Salinas* contains a complaint similar to the one raised by Fountain. In that case, Martinez-Salinas complained, in his § 2255 petition, that his counsel did not adequately explain the effect on his sentence of a specific offense enhancement dealing with his use of a firearm. The district court denied Martinez-Salinas' § 2255 petition, that his attorney appeared to be carrying out the wishes of the defendant not to go to trial. *Id*., at 599. The district court relied on the defendant's representations at his sentencing hearing that he understood the nature of the law with respect to the firearm enhancement. *Id*., at 599.

The appellate court affirmed the dismissal of Martinez-Salinas' § 2255 petition, finding that the defendant did not show that his attorney's alleged error caused him to be ineffective, and that the defendant did not show that he would have had any success in challenging the sentencing enhancement regarding the firearm. *Id*.

Fountain has a similar problem. She has not, and cannot, show that her attorney's representations and/or alleged errors, resulted in any decision or action on her part that she would have changed. Fountain was clearly guilty of participating in an armed jewelry store robbery. She was aware that Kevin Stitt was cooperating with the Government and

14

would be available to testify against her in the event that she wanted a trial. Fountain has never indicated that she would have desired a trial in this matter, even up to the date of her current petition. Without showing that Fountain would have changed some aspect of her case if she had known more about it, Fountain cannot show either that her attorney was ineffective or that she was prejudiced.

**2. Fountain Understood the Terms of Her Plea Agreement.**

Fountain contends that her attorney failed to explain the terms of her plea agreement. Fountain's plea colloquy demonstrates that she was fully aware of the terms of her plea agreement. Her attorney's explanation of the terms of that plea agreement are not important; the only important fact is whether Fountain herself understood the terms of that agreement. The Court's questions, and Fountain's answers as to that subject, are set forth below:

> Court: The lawyers have given me a written guilty plea agreement consisting of 13 pages. I see that you and the lawyers have signed it on page 13; is that right?
> 
> Fountain: Yes.
> 
> Court: Have you read the agreement?
> 
> Fountain: Yes.
> 
> Court: Have you gone over it in detail with your lawyer?
> 
> Fountain: Yes.
> 
> Court: Has she explained the contents of the agreement in detail to you?
> 
> Fountain: Yes.

Court: And do you understand the contents of the agreement?

Fountain: Yes, sir.

Court: Is there anything in here that you do not understand?

Fountain: Just - - no. No. I better not.

(Plea Tr., p. 8)

Court: So I take it also that this is the complete and full and total agreement; is that right too?

Fountain: Yes.

(Plea Tr., p. 9)

Fountain's plea colloquy completely refutes her allegation that her attorney did not advise her as to the terms of the plea agreement. Fountain told this Court, under oath, that she understood the agreement and that her attorney had explained it to her in detail.

Furthermore, Fountain does not set forth any facts about any misunderstanding about her plea agreement. She does not state that there was any portion of the plea agreement that resulted in an unexpected punishment or result. Fountain does not state any reasons why she was prejudiced by her attorney's advice. Fountain's lack of specificity as to her factual allegations is fatal to her claim, as well as her sworn statements that she was, in fact, aware of the terms of the plea agreement and that her attorney had explained it to her.

**3. Fountain's Guilty Plea Was a Knowing, Intelligent Plea.**

Fountain alleges, without any factual basis, that her guilty plea was not voluntary. Where a defendant is represented by counsel during the plea process and enters a guilty

plea upon the advice of counsel, the voluntariness of the plea depends on whether the counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Estes v. United States*, 883 F.2d 645 647 (8th Cir. 1989), citing *Hill v. Lockhart*, 474 U.S. 52, 56, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985).

Estes alleged, in his § 2255 petition, that his counsel "rendered a lot of misadvice." The *Estes* Court found that this conclusory allegation was insufficient to rebut the strong presumption of counsel's competence. *Id*., at 647. The *Estes* Court also found that the guilty plea record disclosed that Estes knew full well of the consequences of his guilty plea and that he understood the district court's sentencing discretion:

> The Court: And am I correct, without specifically following the numbers you cited, that this is a nonbinding plea agreement upon the Court?
>
> Mr. Kettleson [counsel for the government]: Your Honor, it's a plea agreement pursuant to 11(e)(1)(B) of the Rules, which in effect is nonbinding. It's a recommendation on my part.
>
> The Court: It's nonbinding. Mr. Estes, have you heard the two counsel describe what the agreement is?
>
> The Defendant: Mm-hmm (nodding).
>
> The Court: Is that your understanding of what was worked out?
>
> The Defendant: Yeah; I guess so.
>
> The Court: Are you aware that it isn't absolutely binding on the Court; that I could give you more or I could give you less at the time of sentencing?
>
> The Defendant: Mm-hmm (nodding).

> The Court: You're aware of that?
>
> The Defendant: Yes.
>
> The Court: That gamble, that risk you're taking?
>
> The Defendant: Yeah.

*Estes*, 883 F.2d at 648.

Fountain's guilty plea record is much more expansive than was the case in Estes Fountain stated that she was aware of the range of punishment for each count of her indictment and was aware of this Court's sentencing discretion. She cannot establish that her guilty plea was involuntary, given the nature of her understanding of the possibilities of her sentence. Furthermore, her bare bones allegations that her guilty plea was "not made voluntarily," without any factual basis to support that claim, is insufficient as a matter of law to permit this Court to find in Fountain's favor.

Fountain also claims that her attorney "failed to explain the terms of the agreement." However, Fountain does not state exactly what she might have misunderstood about her plea agreement or its terms. Again, this bare allegation does not provide enough factual support to discredit her attorney's performance.

### 4. Counsel's Advice Concerning Length of Sentence Lacks Sufficient Grounds For Relief.

Fountain complains that her attorney "spoke" of her receiving a guaranteed sentence of twenty years if she did not accept the plea offer. Although the Government contests the allegation, even if true, the allegation does not rise to the level of ineffective assistance of counsel.

The defendant made much the same argument in *United States v. Enriquez*, 205 F.3d 345 (8th Cir. 2000). Enriquez filed his § 2255 petition, alleging that his attorney gave him incorrect advice concerning his sentence. The district court held that the parties' plea agreement contained accurate representations of the minimum and maximum sentences that could be imposed and that those possibilities were explained to the defendant. *Id*., at 348.

Fountain has the same disability. Her written plea agreement contained a section that explained the maximum sentences that could be imposed by law. This Court went over that section in Fountain's plea hearing. Fountain stated to this Court that she understood her ranges of punishment. She cannot contend now that she did not understand her possible range of punishment, no matter what her attorney may have told her. Fountain does not allege that she would have stood trial but for her attorney's advice. Therefore, she cannot show that she has been prejudiced by her attorney's advice.

**5. Fountain's Petition May Be Dismissed Without an Evidentiary Hearing.**

A petitioner is entitled to an evidentiary hearing on a § 2255 motion, unless the motion and the files and records of the case conclusively show that the petitioner is entitled to no relief. *Jeffries v. United States*, 721 F.3d 1008, 1014 (8th Cir. 2013); Title 28, U.S.C., § 2255(b). In this instant case, Fountain's allegations of error can be disproven by the record in this case. The plea colloquy alone was sufficient to refute any allegation that Fountain was uninformed about aspect of her guilty plea or possible punishment. Because the record is so clear in this case, this Court finds the issues against Fountain and dismisses her petition without an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, this Court denies Fountain's § 2255 petition, without a hearing.

**IT IS FURTHER ORDERED** this Court will not issue a certificate of appealability because Fountain has not made a substantial showing of the denial of a federal constitutional right.

Dated this 28th day of July, 2015.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE